NO. 12-00-00246-CR
 

IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS




CHRISTINA MARTINEZ,
§
 APPEAL FROM THE 114TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF

 

THE STATE OF TEXAS,

APPELLEE
§
 SMITH COUNTY, TEXAS







 Christina Martinez ("Appellant") appeals her conviction of capital murder, for which she 
received a mandatory life-sentence. Appellant raises three issues on appeal. We reverse and remand
for a new trial.


Background


 On July 1, 1999, Appellant traveled to Lake Palestine with friends and acquaintances,
Hersain Gomez ("Gomez"), Susana Arroyo ("Arroyo"), Armando Hinojosa ("Hinojosa"), Michael
Thompson ("Thompson") and Crystal A. Garcia ("Garcia"). (1) The group traveled together in
Hinojosa's car to Kiloland Park and spent the day drinking alcohol, smoking marijuana, swimming,
listening to music and dancing. That afternoon, the victim, Jeffrey Adam Carrier ("Carrier"), drove
up in a blue Honda Civic. The passenger, Aaron Warren ("Warren"), exited the vehicle and inquired
generally of the group if anyone knew where he could buy some marijuana. Warren was told that
no one had any marijuana for him to purchase, but if he returned later that evening, they would go
to Tyler with him and help him find a dealer. Garcia testified that after Warren and Carrier left
Kiloland Park, the group had a discussion outside of her presence, which she later discovered
involved a plan to rob the two boys, Carrier and Warren. (2) The general consensus was that the boys
would be beaten up and their money taken. Later that evening, the two boys returned to Kiloland
Park as instructed.

 Hinojosa's car battery was dead. Warren, Carrier and Thompson took Carrier's car to find
jumper cables. While they were gone, the remaining members of the group, Garcia included, further
discussed the plan to rob Warren and Carrier. At this point, Gomez stated that since the punishment
was essentially the same for aggravated robbery, they might as well kill the two boys. Subsequently,
Warren, Carrier and Thompson returned and, with the help of a passer-by in another vehicle, were
able to jump-start Hinojosa's car. The group and the two boys left Kiloland Park in two cars. In one
car, driven by Hinojosa, also rode, Thompson, Gomez and Garcia. In the other car, driven by
Carrier, also rode Warren, Arroyo and Appellant. The group and the two boys first went to Kilo's
liquor store, where Thompson purchased beer, cigarettes and a bag of Cheetos. The group and the
two boys then left the liquor store in the same cars in which they had arrived.

 According to Garcia's testimony, the group in Hinojosa's car further discussed the plan,
which was to separate the two boys prior to robbing them. Garcia further testified that the fabricated
reason to be given the two boys in order to separate them would be that Thompson's uncle would
sell them the marijuana, but did not like large groups of people at his house. Therefore, Hinojosa,
Thompson and one of the boys would leave the rest of the group and Carrier, knock on a stranger's
door, purportedly Thompson's uncle, and inquire about purchasing marijuana. According to Garcia,
Gomez again suggested that they kill the two boys. The two cars stopped on a street south of the
Tyler city limits, where Gomez and Thompson left the group momentarily to urinate. When they
returned, Carrier and Warren were told that they had passed the street on which Thompson's uncle's
house was located and that they needed to double back. The apparent purpose of telling the two boys
this was to find a more remote street.

 The cars, containing the same occupants, drove on and turned down County Road 122, also
known as Skidmore Lane. Shortly thereafter, the two cars stopped. Hinojosa and Thompson left
with Warren in Hinojosa's car in search of Thompson's fictitious uncle's house. The rest of the
group, including Appellant, remained with Carrier by his car. However, before Thompson and
Warren departed, Gomez instructed Garcia to retrieve a knife from the passenger-side, seat-back
pocket of Hinojosa's car and to use it to puncture the tires on Carrier's car. Garcia did as she was
told and, unbeknownst to Carrier, used the knife to puncture the rear passenger-side tire of Carrier's
car. The tire quickly deflated. Garcia handed the knife to Appellant and exclaimed to Carrier, "Say
man, your tire is flat!"

 Carrier, who was sitting in the driver's seat, exited his car and retrieved the spare tire and a
pouch containing a tire iron and jack assembly from the trunk. Carrier then proceeded to begin
changing the rear, passenger-side tire. While Carrier was kneeling down to remove the flat tire,
Gomez picked up the spare tire, held it over Carrier for a moment, then threw the tire down at
Carrier's head. The tire struck Carrier, but he was not knocked to the ground. Carrier proceeded to
defend himself against Gomez's attack. During the fight, Carrier was apparently getting the best of
Gomez until Arroyo hit him twice with the car jack. Carrier fell to the ground and Gomez and
Arroyo continued to beat him. At one point, Carrier struck Arroyo in the leg. Angered that Carrier
had hit Arroyo, who was her cousin, Garcia kicked Carrier as he lay on the ground. Garcia then took
the tire iron that lay by the car and hit Carrier multiple times in the shoulder with it. It is undisputed
that Appellant took no part in the actual beating of Carrier.

 Gomez and Arroyo then dragged Carrier, still conscious, from the roadside into the nearby
wooded area. Garcia then proceeded to steal items from Carrier's car while Appellant attempted to
wipe fingerprints from the car's exterior. Subsequently, Gomez called Garcia to the woods and
Arroyo informed her that Carrier had given them his wallet. Garcia returned to the car only to be
called to the edge of the woods once again. This time, Gomez told her to get the knife for him. 
Garcia retrieved the knife from Appellant, who, according to Garcia, said, "Here, hand this to
Demon." (3) Garcia then gave the knife to Gomez. Gomez used the knife to stab Carrier to death.

 Subsequently, Hinojosa drove up in his car alone. Garcia and Appellant got into the car with
him. Garcia and Appellant informed Hinojosa that Gomez and Arroyo had just killed Carrier. As
Gomez and Arroyo approached, Garcia inquired as to the whereabouts of the knife, which she feared,
if left behind, could be traced to her father. Hinojosa drove off to go pick up Thompson, leaving
Gomez and Arroyo to search for the knife. When they reached Thompson and Warren, Garcia
informed Thompson that Gomez had killed Carrier. Hinojosa told Thompson, who was angered by
the news he had just received, to get into the car. Warren walked around to the other side of the car. 
However, before Warren could get into the car, Hinojosa sped off, leaving Warren, who was still
unaware that his friend was dead. Upon returning to Carrier's car, the three picked up Gomez and
Arroyo and proceeded to Thompson's house. During the drive to Thompson's house, Gomez
expressed his willingness to go back and kill Warren as well so that there would not be any
witnesses. However, despite Gomez's wishes, Hinojosa drove on to Thompson's house.

 According to Garcia's testimony, once the group reached Thompson's house, they discussed
how they might cover up the crime. Gomez threatened the group, saying that if anyone "snitched,"
he would kill them. The group then left Thompson at his home and proceeded to Appellant's house,
where Garcia and Appellant were dropped off. Appellant and Garcia ultimately spent the night at
Appellant's sister's house. Once at Appellant's sister's house, Appellant and Garcia contacted two
male friends, who later arrived by taxi, (4) and spent the night. Appellant and Garcia were apprehended
the next day. The police also arrested Hinojosa and Thompson. Gomez and Arroyo are still at large
and believed to be in Mexico.

 Appellant was charged with the capital murder of Carrier as a party to the offense. At trial,
testimony and exhibits were admitted, over objection, (5) related to Appellant's association with gangs,
specifically, the Northside Crips of Tyler, Texas. At the end of the State's closing argument, the
prosecuting attorney made the following statement relating to Appellant's purported gang
involvement:


 You know, robberies are violent. Gang members are violent. And you heard the gang testimony, and you can
believe that she is an associate or a member of the Northside Crips. I think it's pretty clear or Crystal Garcia
made it real clear that they don't carry cards saying, "I'm a gang member. I'm a member of the Northside Crips. 
I get a special discount at the movies.


 It's clear. You've got a gang member throwing signs with his arm around her neck. It's as clear as day that
she's a gang member, and gang members are violent.


 And people who talk about killing their victims after robbing the victims are violent. And when people use
knives and weapons and hit people over the head with tire jacks, those are violent people. And people who give
the murder weapons to a man named Demon is a violent act.


 And it shows her knowledge, and it shows her knowledge after seeing all that she had seen, and she should have
anticipated that death would occur. Real simple. She should have anticipated death would occur. And she's
guilty of capital murder.



The jury found Appellant guilty of the capital murder of Carrier and Appellant received a mandatory
life-sentence.


Relevancy of Gang Evidence

 In her first issue, Appellant contends that the trial court erred in admitting testimony and
exhibits related to Appellant's purported gang involvement as such evidence was irrelevant and
prejudicial. The State contends that such evidence was relevant to prove the necessary element that
Appellant should have anticipated that death would occur as a result of carrying out the conspiracy
to rob Carrier and Warren, see Tex. Pen. Code Ann. § 7.02(b), and admissible to show knowledge
under Texas Rule of Evidence 404(b). We review the admissibility of this evidence under an abuse
of discretion standard. See Prystash v. State, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999); Caddell
v. State, 865 S.W.2d 489, 492 (Tex. App.-Tyler 1993, no pet.).

 "Relevant evidence" means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less probable than it would
be without the evidence. Tex. R . Evid. 401. The State cites our recent opinion in Thompson v.
State, 54 S.W.3d 88, 98 (Tex. App.-Tyler 2001, no pet.), (6) in which we stated that evidence related
to Thompson's tattoos was relevant where it was offered to show that Thompson had knowledge of
gangs and gang members, which in turn, tended to show that Thompson had knowledge of the
violent activities in which gangs, such as the Northside Crips, tend to engage, which in turn tended
to demonstrate that Thompson should have anticipated Carrier's death in the course of carrying out
the conspiracy, with co-conspirator Gomez, to rob the two boys. Id. However, the present case is
distinguishable from Thompson. In Thompson, the State put on testimony that the Northside Crips
had been known to conduct drive-by shootings, and had been involved in murders, aggravated
robberies, aggravated assaults, robberies, assaults and other such activities. Id. at 96. Our review
of the record in the instant case reveals no evidence whatsoever related to the types of violent
activities, if any, engaged in by the Northside Crips of Tyler, Texas. Thus, while this same evidence
was relevant in Thompson, without any evidence related to the violent activities in which the
Northside Crips engage, evidence of Appellant's association with the Northside Crips has no
tendency to make the existence of any fact that is of consequence to the determination of this action
more probable or less probable than it would be without the evidence, including the issue of whether
Appellant should have anticipated that death would occur as a result of carrying out the conspiracy
to rob Carrier and Warren. Albeit based on the same factual situation as Thompson, the instant case
is very different due to the State's omission of critical evidence related to certain violent activities
in which the Northside Crips are known to have engaged. Thus, we conclude that the evidence of
Appellant's association with gangs and gang members, including the Northside Crips, was
inadmissible. See Tex. R. Evid. 402; 404(b). Therefore, by admitting such evidence over
Appellant's objection, the trial court abused its discretion.


Prejudicial Nature of Gang Evidence

 Moreover, even assuming that the evidence of Appellant's association with the Northside
Crips did have some probative value related to whether Appellant should have anticipated that death
would occur, it would still be inadmissible. Although relevant, evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,
or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative
evidence. See Tex. R. Evid. 403. Rule 403 "favors admissibility of relevant evidence, and the
presumption is that relevant evidence will be more probative than prejudicial." Miller v. State, 2
S.W.3d 475, 482 (Tex. App.-Tyler 1999, no writ), citing Long v. State, 823 S.W.2d 259, 271 (Tex.
Crim. App. 1991). However, even assuming some probative value, without evidence related to the
types of violent activities engaged in by the Northside Crips, the probative value of evidence relating
to Appellant's association with the Northside Crips is very low. See, e.g., Anderson v. State, 901
S.W.2d 946, 950 (Tex. Crim. App. 1995) ("Although relevant [in a punishment phase context], gang
membership alone would be meaningless to a jury which has no knowledge of the gang's purpose
or activities . . . Without this additional information, the jury has nothing to conclude whether
membership in this gang is a positive or negative character trait of the defendant"). On the other
hand, evidence of gang membership, as it reflected on Appellant, was very prejudicial. See Galvez
v. State, 962 S.W.2d 203, 205-06 (Tex. App.-Austin 1998, pet. ref'd) (Evidence of bad character
may distract the jury from considering whether the accused is guilty of the crime charged and tempt
it to convict an individual for general bad behavior); see also Mayes v. State, 816 S.W.2d 79, 86
(Tex. Crim. App. 1991) (Evidence of a defendant's bad character traits possesses a devastating
impact on a jury's rational disposition towards other evidence).

 The prejudicial nature of the evidence of Appellant's gang association is best demonstrated
by its use in the final words of the State's closing argument. Although the State emphasizes in its
brief how closely it tied Appellant's gang association to the requisite knowledge element, we believe
that this act only heightens the prejudicial nature of the gang evidence. The State urged the jury to
presuppose generalized violent character traits of a group of people when there was no evidence of
record that the Northside Crips were generally known to engage in such violent activities. We
further note that although Appellant has not raised the issue of legal sufficiency, there is little other
evidence, if any, which could arguably be construed to independently support the so-called
knowledge element. As such, by using evidence of Appellant's gang association to attempt to cause
the jury to presuppose that the Northside Crips were generally known to engage in violent activities,
when there was no evidence of such violent activities in the record, and further using the gang
evidence and the jury's suppositions to prove up the necessary knowledge element, the State
heightened the prejudice already surrounding the evidence of Appellant's gang association to the
extent that we must conclude that such prejudice greatly outweighs the probative value of the
evidence, if any. Appellant's first issue is sustained.


Harm Analysis

 Having determined that Appellant's first issue is meritorious, we must now conduct a harm
analysis. Rule of Appellate Procedure 44.2(b) provides that non-constitutional errors that do not
affect the substantial rights of the defendant must be disregarded. See Tex. R. App. P. 44.2(b). The
court of criminal appeals interprets this rule to mean that a conviction should not be overturned if
the appellate court, after examining the record as whole, has fair assurance that the error did not
influence the jury, or had but a slight effect. See King v. State, 953 S.W.2d 266, 271 (Tex. Crim.
App. 1997). In applying the test for "harmless error," our primary question is what effect the error
had, or reasonably may have had, upon the jury's decision. See Fowler v. State, 958 S.W.2d 853,
865 (Tex. App.-Waco 1998), affirmed, 991 S.W.2d 258 (Tex. Crim. App. 1999). We must view the
error, not in isolation, but in relation to the entire proceeding. Id. If one cannot say, without fair
assurance, after pondering all that happened without stripping the erroneous action from the whole,
that the judgment was not substantially swayed by the error, it is impossible to conclude that
substantial rights were not affected. Id. The inquiry cannot be merely whether there was enough
evidence to support the result, apart from the phase affected by the error. Id. It is rather, whether
the error itself had substantial influence. Id. If so, or if one is left in grave doubt, the conviction
cannot stand. Id.

 In the case at hand, the State greatly emphasized the error in the final words of its closing
argument. See, e.g., Macias v. State, 959 S.W.2d 332, 340 (Tex. App.-Houston [14th Dist.] 1997,
pet. ref'd) (noting the harmful nature of emphasizing error in closing argument under former Texas
Rule of Appellate Procedure 81(b)(2)). By its emphasis on Appellant's gang association, the State
attempted to cause the jury to presuppose that the Northside Crips were generally known to engage
in violent activities, when there was no evidence of such violent activities in the record. In so doing,
the State was able to obtain a conviction by substituting assumptions for evidence. Moreover, the
implication of the State's evidence is that Appellant is a criminal because she is associated with the
Northside Crips. See Macias, 959 S.W.2d at 340. 

 The amount of gang-related evidence was only a small percentage of the total evidence
introduced during the trial of this case. However, as it related to other evidence arguably supportive
of the knowledge element, its percentage was much greater. As for such other evidence, there was
testimony that Gomez suggested, in Appellant's presence, killing the two boys if everyone in the
group was in agreement. (7) There was further testimony that Appellant was present during the fight
between Gomez and Carrier, during which Arroyo struck Carrier with the car jack. There is even
evidence that Appellant gave the knife to Garcia, instructing her to give it to Gomez. However, even
in light of such evidence, we conclude that the likelihood that the jury placed a considerable amount
of weight on Appellant's gang association to be undeniable. 

 Based on our review of the record, and applying the harm analysis required in rule 44.2(b),
we do not have fair assurance that the trial court's error in admitting the evidence of Appellant's
gang association had no, or but a slight, affect on the jury's finding that Appellant should have
anticipated that death would occur as a result of carrying out the conspiracy to rob Carrier and
Warren. We are confident that the magnitude of this error was such that it disrupted the jury's
orderly evaluation of the evidence, thereby substantially swaying the judgment and tainting the
conviction. Thus, we conclude that the complained of evidence was harmful to Appellant. (8)

 Accordingly, we reverse the judgment of the trial court and remand this cause for a new trial.


 JIM WORTHEN 

 Justice


Opinion delivered December 21, 2001.

Panel consisted of Davis, C.J., Worthen, J., and Griffith, J.

(PUBLISH)
1. These individuals are referred to collectively as "the group."
2. Carrier and Warren, who the record indicates were college-age individuals, are referred to collectively as
the "two boys."
3. "Demon" is Gomez's nickname.
4. Garcia testified that she payed for the taxi with ten dollars she had stolen from Carrier's wallet.
5. At trial, at the first instance when the State began to introduce evidence on the "gang information,"
Appellant objected generally that the gang-related information was irrelevant and prejudicial. The issue had
previously been raised in Appellant's motion in limine, which was overruled apparently based on the State of
Texas's (the "State") representations that the gang evidence, in conjunction with testimony it intended to offer from
other witnesses regarding activities in which gangs such as the Northside Crips generally are known to engage, was
relevant to show that Appellant should have anticipated that death would occur as a result of carrying out the
conspiracy to rob the two boys. See Tex. R. Evid. 404(b); Tex. Pen. Code Ann. § 7.02(b) (Vernon 1994). By
objecting to the gang-related evidence upon its initial introduction, Appellant preserved error and was not required to
iterate this objection. See Tex. R. Evid. 103(a)(1); Heidelberg v. State, 36 S.W.3d 668, 672 (Tex. App.-Houston
[14th Dist.] 2001, no pet.).
6. Thompson is the appeal of Michael Thompson, who is a member of the group in the instant case. 
Thompson arises out of the same facts as the instant case.
7. The record reflects that everyone in the group did not expressly indicate that they were in agreement with
Gomez's suggestion that they kill the two boys.
8. Appellant has raised two other issues. However, since we will remand this cause for a new trial due to our
disposition of issue one, it is not necessary for us to address these issues.