NO. 12-00-00246-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


CHRISTINA MARTINEZ,
§
 APPEAL FROM THE 114TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 SMITH COUNTY, TEXAS

 

OPINION


 Christina Martinez ("Appellant") appeals her conviction of capital murder, for which she 
received a mandatory life sentence. On original submission, Appellant raised three issues. See
Martinez v. State, No. 12-00-00246-CR, 2001 WL 1654493, at *1 (Tex. App-Tyler December 21,
2001) (not yet released for publication). In her first issue, Appellant contended that evidence of gang
affiliation was improperly admitted. Id. at *3. We reversed the trial court's judgment, holding that
the relevance of the aforementioned gang evidence was outweighed by its prejudicial nature. Id.
Concluding that Appellant had waived the issue, the court of criminal appeals reversed our holding
and remanded the cause for our consideration of the remaining two issues. See Martinez v. State,
98 S.W.3d 189, 193 (Tex. Crim. App. 2003). We affirm. 


Background


 On July 1, 1999, Appellant traveled to Lake Palestine with friends and acquaintances,
Hersain Gomez ("Gomez"), Susana Arroyo ("Arroyo"), Armando Hinojosa ("Hinojosa"), Michael
Thompson ("Thompson"), and Crystal A. Garcia ("Garcia"). (1) The group traveled together in
Hinojosa's car to Kiloland Park and spent the day drinking alcohol, smoking marijuana, swimming,
listening to music, and dancing. That afternoon, the victim, Jeffrey Adam Carrier ("Carrier"), drove
up in a blue Honda Civic. The passenger, Aaron Warren ("Warren"), exited the vehicle and inquired
generally of the group if anyone knew where he could buy some marijuana. Warren was told that
no one had any marijuana for him to purchase, but if he returned later that evening, they would go
to Tyler with him and help him find a dealer. Garcia testified that after Warren and Carrier left
Kiloland Park, the group had a discussion outside of her presence, which she later discovered
involved a plan to rob the two boys, Carrier and Warren. (2) The general consensus was that the boys
would be beaten up and their money taken. Later that evening, the two boys returned to Kiloland
Park as instructed.

 Hinojosa's car battery was dead. Warren, Carrier, and Thompson took Carrier's car to find
jumper cables. While they were gone, the remaining members of the group, Garcia included, further
discussed the plan to rob Warren and Carrier. At this point, Gomez stated that since the punishment
was essentially the same for aggravated robbery, they might as well kill the two boys. Subsequently,
Warren, Carrier, and Thompson returned and, with the help of a passerby in another vehicle, were
able to jump-start Hinojosa's car. The group and the two boys left Kiloland Park in two cars. In one
car, driven by Hinojosa, also rode Thompson, Gomez, and Garcia. In the other car, driven by
Carrier, also rode Warren, Arroyo, and Appellant. The group and the two boys first went to Kilo's
liquor store, where Thompson purchased beer, cigarettes, and a bag of Cheetos. The group and the
two boys then left the liquor store in the same cars in which they had arrived.

 According to Garcia's testimony, the group in Hinojosa's car further discussed the plan,
which was to separate the two boys prior to robbing them. Garcia testified that the fabricated reason
to be given the two boys in order to separate them would be that Thompson's uncle would sell them
the marijuana, but did not like large groups of people at his house. Therefore, Hinojosa, Thompson,
and one of the boys would leave the rest of the group and Carrier, knock on a stranger's door,
purportedly that of Thompson's uncle, and inquire about purchasing marijuana. According to
Garcia, Gomez again suggested that they kill the two boys. The two cars stopped on a street south
of the Tyler city limits, where Gomez and Thompson left the group momentarily to urinate. When
they returned, Carrier and Warren were told that they had passed the street on which Thompson's
uncle's house was located and that they needed to double back. The apparent purpose of telling the
two boys this was to find a more remote street.

 The cars, containing the same occupants, drove on and turned down County Road 122, also
known as Skidmore Lane. Shortly thereafter, the two cars stopped. Hinojosa and Thompson left
with Warren in Hinojosa's car in search of Thompson's fictitious uncle's house. The rest of the
group, including Appellant, remained with Carrier by his car. However, before Thompson and
Warren departed, Gomez instructed Garcia to retrieve a knife from the passenger-side, seat-back
pocket of Hinojosa's car and to use it to puncture the tires on Carrier's car. Garcia did as she was
told and, unbeknownst to Carrier, used the knife to puncture the rear passenger-side tire of Carrier's
car. The tire quickly deflated. Garcia handed the knife to Appellant and exclaimed to Carrier, "Say
man, your tire is flat!"

 Carrier, who was sitting in the driver's seat, exited his car and retrieved the spare tire and a
pouch containing a tire iron and jack assembly from the trunk. Carrier then proceeded to begin
changing the rear, passenger-side tire. While Carrier was kneeling down to remove the flat tire,
Gomez picked up the spare tire, held it over Carrier for a moment, then threw the tire down at
Carrier's head. The tire struck Carrier, but he was not knocked to the ground. Carrier proceeded to
defend himself against Gomez's attack. During the fight, Carrier was apparently getting the best of
Gomez until Arroyo hit him twice with the car jack. Carrier fell to the ground and Gomez and
Arroyo continued to beat him. At one point, Carrier struck Arroyo in the leg. Angered that Carrier
had hit Arroyo, who was her cousin, Garcia kicked Carrier as he lay on the ground. Garcia then took
the tire iron that lay by the car and hit Carrier multiple times in the shoulder with it. It is undisputed
that Appellant took no part in the actual beating of Carrier.

 Gomez and Arroyo then dragged Carrier, still conscious, from the roadside into the nearby
wooded area. Garcia proceeded to steal items from Carrier's car while Appellant attempted to wipe
fingerprints from the car's exterior. Subsequently, Gomez called Garcia to the woods and Arroyo
informed her that Carrier had given them his wallet. Garcia returned to the car only to be called to
the edge of the woods once again. This time, Gomez told her to get the knife for him. Garcia
retrieved the knife from Appellant, who, according to Garcia, said, "Here, hand this to Demon." (3) 
Garcia then gave the knife to Gomez. Gomez used the knife to stab Carrier to death.

 Subsequently, Hinojosa drove up in his car alone. Garcia and Appellant got into the car with
him. Garcia and Appellant informed Hinojosa that Gomez and Arroyo had just killed Carrier. As
Gomez and Arroyo approached, Garcia inquired as to the whereabouts of the knife, which she feared,
if left behind, could be traced to her father. Hinojosa drove off to go pick up Thompson, leaving
Gomez and Arroyo to search for the knife. When they reached Thompson and Warren, Garcia
informed Thompson that Gomez had killed Carrier. Hinojosa told Thompson, who was angered by
the news he had just received, to get into the car. Warren walked around to the other side of the car. 
However, before Warren could get into the car, Hinojosa sped off, leaving Warren, who was still
unaware that his friend was dead. Upon returning to Carrier's car, the three picked up Gomez and
Arroyo and proceeded to Thompson's house. During the drive to Thompson's house, Gomez
expressed his willingness to go back and kill Warren as well so that there would not be any
witnesses. However, despite Gomez's wishes, Hinojosa drove on to Thompson's house.

 According to Garcia's testimony, once the group reached Thompson's house, they discussed
how they might cover up the crime. Gomez threatened the group, saying that if anyone "snitched,"
he would kill them. The group then left Thompson at his home and proceeded to Appellant's house,
where Garcia and Appellant were dropped off. Appellant and Garcia ultimately spent the night at
Appellant's sister's house. Once at Appellant's sister's house, Appellant and Garcia contacted two
male friends, who later arrived by taxi, (4) and spent the night. Appellant and Garcia were apprehended
the next day. The police also arrested Hinojosa and Thompson. Gomez and Arroyo are still at large
and believed to be in Mexico.

 Appellant invoked her right to counsel. Subsequently, Appellant's mother and sister came
to the Tyler Police Station where Appellant was being held and spoke to David Dobbs ("Dobbs"),
a prosecutor with the Smith County District Attorney's Office. Appellant's sister testified that
Dobbs told them about another murder case where the people who talked to the police and helped
them in the beginning got off lighter than the people who had refused to talk. Yet, Appellant's sister
conceded that Dobbs did not make them any promises. Dobbs testified that Appellant's sister
inquired as to whether if Appellant cooperated with law enforcement, she would be let out of jail or
could otherwise improve her situation. (5) Dobbs testified that he told Appellant's sister that he could
make no promises because he did not know what role Appellant had in what had occurred. Dobbs
continued, 


 I told her that her sister would have to make the decision as to whether or not she cooperated, that I
had seen cases in the past where people had had less roles in a case, and they had cooperated, and
when it came down to the trier of fact deciding what had happened to them, that it would help them.


 I had seen cases where people had cooperated a whole lot and their role was very strong in the offense,
and it made no difference to them. That was a decision that they had to make. We didn't know what
her role was, and there was nothing that we could do in terms of making her any kind of promise.


 I told them that . . . her sister was going to have to decide whether she cooperated without any type
of a promise or benefit from us because we couldn't make any type of promise . . . 



Dobbs further testified that following his conversation with Appellant's sister, she and Appellant's
mother approached Tyler Police Detective Bobby Van Ness ("Van Ness") and asked him if they
could speak with Appellant. 

 Appellant was permitted to speak with her mother and sister. Subsequently, Appellant's
mother told Van Ness that Appellant wanted to speak with police. At the beginning of the interview
between police and Appellant, Van Ness felt that Appellant did not want to talk to them and had was
not willing to waive her right to an attorney. As Van Ness began to leave the interrogation room,
Dobbs entered and stated that Appellant needed to be taken to jail. Appellant's mother urged
Appellant to cooperate. Appellant then indicated that she wished to speak with police. Appellant
was advised of her rights, waived her rights, and stated that she had asked to speak with the police
after initially requesting an attorney.

 Appellant was charged with capital murder of Carrier as a party to the offense. The jury
found Appellant guilty of the capital murder of Carrier and Appellant received a mandatory life
sentence.


Motion to Suppress Confession

 In her second issue, Appellant argues that the trial court erred in refusing to suppress her
videotaped confession. Specifically, Appellant contends that the State improperly used Appellant's
mother and sister to convince Appellant to give a confession after she had invoked her right to
counsel.

 We review a trial court's ruling on a motion to suppress for abuse of discretion. See
Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App.1996); Curry v. State, 965 S.W.2d 32, 33
(Tex. App.-Houston [1st Dist.] 1998, no pet.). In reviewing the trial court's ruling, we apply a
bifurcated standard of review. See Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App.
2000); Hernandez v. State, 957 S.W.2d 851, 852 (Tex. Crim. App. 1998). We give almost total
deference to the trial court's determination of historical facts, while conducting a de novo review of
the trial court's application of the law to those facts. See Carmouche, 10 S.W.3d at 327. The trial
court is the exclusive finder of fact in a motion to suppress hearing, and as such, it may choose to
believe or disbelieve any or all of any witness's testimony. Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990). Furthermore, when, as in the instant case, "the trial court fails to file
findings of fact, we view the evidence in the light most favorable to the trial court's ruling and
assume that the trial court made implicit findings of fact that support its ruling as long as those
findings are supported by the record." State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). 
If the trial judge's decision is correct on any theory of law applicable to the case, the decision will
be sustained. Id. at 856. 

 Once a suspect has invoked his right to counsel, all interrogation by the police must cease
until counsel is provided or until the suspect himself reinitiates conversation. See Kinkins v. State,
894 S.W.2d 330, 349 (Tex. Crim. App.1995). Our analysis is twofold. First, we determine whether
the accused actually invoked his right to counsel. See Smith v. Illinois, 469 U.S. 91, 95-97, 105 S.
Ct. 490, 492-94, 83 L. Ed. 2d 488, 494 (1984). Second, we examine how police obtained the
statement. Statements obtained after the suspect has invoked his right to counsel are admissible only
if the court finds that the accused initiated the discussion and that he knowingly and intelligently
waived the rights he had invoked. Id., 49 U.S. at 95, 105 S. Ct. at 492-93. The State has the burden
of establishing a valid waiver. See Upton v. State, 853 S.W.2d 548, 553 (Tex. Crim. App. 1993). 
The statement is admissible if all of these factors are met. See Etheridge v. State, 903 S.W.2d 1, 18
(Tex. Crim. App. 1994).

 Appellant cites to Kreyssig v. State, 935 S.W.2d 886 (Tex. App.-Texarkana 1996, pet. ref'd)
as the only case on point concerning her second issue. Kreyssig was arrested upon suspicion that
he committed murder and invoked his right to counsel. Id. at 887. A few hours later, Kreyssig's
stepfather came to the sheriff's office. Id. Kreyssig's stepfather asked to speak to a sheriff's deputy,
who told Kreyssig's stepfather that three other persons who were also arrested implicated Kreyssig
as having masterminded the murder. Id. at 888. The deputy further related to Kreyssig's stepfather
that because Kreyssig had requested an attorney, the police could not talk to him. Id. Kreyssig's
stepfather asked what would be the best thing for Kreyssig to do, to which the deputy responded,
"[I]t would be in the boy's best interest to talk to us and tell us his side of the story. We would be
glad to listen." Id. The deputy elaborated that the police could not talk to Kreyssig unless he
initiated the contact and sent a note stating that he wanted to waive his right to an attorney. Id. The
deputy then made arrangements for Kreyssig to call the front desk, an area away from the deputy's
office, and talk with his stepfather. Id.  Later that morning, Kreyssig sent a handwritten, signed note
to the deputy indicating that he wanted to talk. Id. He was brought to the deputy's office, was again
read his Miranda (6) warnings, signed a form waiving his rights, stated that he understood such rights,
and gave the deputy a written statement detailing his involvement in the murder. Id.  

 As in the case at hand, neither party in Kreyssig disputed that Kreyssig clearly expressed his
desire for an attorney. Id. at 889. The court of appeals noted that police may not threaten, trick, or
cajole an accused into waiving his constitutional rights. Id. Yet, concluding that there was no
evidence that Kreyssig was tricked or cajoled into waiving his rights, the court held as follows:

 [The deputy's] conversation with [Kreyssig's stepfather] does not constitute state action. [The
Deputy] did not initiate contact with [Kreyssig's stepfather], nor did he request that [Kreyssig's
stepfather] perform a specific task or function. There is no indication that [the deputy] intended for
[Kreyssig's stepfather] to act on his statement or any indication that [Kreyssig's stepfather] actually
followed [the deputy's] advice. [Kreyssig's stepfather's] actions were those of a private person.


 ....


 Even if [Kreyssig's stepfather] persuaded Kreyssig to waive his earlier request for counsel, his actions
did not constitute police interrogation.



Id. at 889-90.

 Here, the record, viewed in a light most favorable to the trial court's ruling, reflects that
Appellant's mother and sister initiated contact with Dobbs. There is no indication that Dobbs
requested either Appellant's mother or sister to perform a specific task or function. Furthermore,
there is no indication that Dobbs intended for Appellant's mother or sister to act on his behalf. 

 Appellant argues that Kreyssig is distinguishable from the instant case because "we know
what Appellant was told [as to] what . . . Dobbs had said." The fact that the substance of the
conversation between Dobbs and Appellant's mother and sister may have been related to Appellant
is immaterial. The court of appeals' analysis in Kreyssig concerned whether police had threatened,
tricked, or cajoled Kreyssig into waiving his constitutional rights. Id. 889. Thus, the proper analysis
centers upon whether Dobbs either requested that Appellant's mother or sister perform a specific task
or function, or whether there is any evidence that he intended for Appellant's mother or sister to act
on his statements. 

 However, Appellant further argues that the "only logical inference that can be drawn is that
the deputy hopes for the relative to convey the advice to the defendant." Yet, viewing the evidence,
as we must, in a light most favorable to the trial court's ruling, there is no indication that Appellant
was either was tricked or cajoled into waiving her rights. Further, the record does not reflect that
Dobbs intended that Appellant's mother or sister act on his behalf in any manner. Absent such
evidence, we cannot conclude that the actions of Appellant's mother and sister amounted to state
action, but rather, conclude that such actions were those of private persons. Accordingly, since the
record reflects both that Appellant initiated the discussion with police and that she knowingly and
intelligently waived the rights she had invoked, we hold that the trial court did not abuse its
discretion in denying Appellant's motion to suppress. Appellant's second issue is overruled.


Prosecutorial Argument

 In her third issue, Appellant argues that the trial court erred by informing the jury that it had
overruled Appellant's objection to the State's attempt to offer Appellant's grand jury testimony,
which had occurred outside the jury's presence. The trial court's comments to which Appellant
refers are as follows:


 Jurors, I like to keep you informed as much as I can of what's taken place. We brought you in about
35 minutes later than what I told you I would. Remember what I said, as a trial progresses, points of
law come up about whether something is admissible or not, and I have to do that outside the presence
of the jury.


 Please be assured that while you were in there twiddling your thumbs, we were pressing ahead to get
you back in as quickly as possible.


 Now let me explain one thing. The State has indicated that they next wish to present grand jury
testimony of the defendant. The defendant's counsel objected to this, and it was overruled.


 Now, the way that this is done, the grand jury testimony is usually in the form of -


 [APPELLANT'S COUNSEL]: May we approach the bench, please?


 THE COURT: Yes.


 (At the bench, on the record.)


 [APPELLANT'S COUNSEL]: And I was in the middle of - I just didn't want - I didn't think it would
be proper for the Court to indicate the purpose of the hearing or what the ruling was.


 THE COURT: No, I'm not. I was just going to tell them that we were involved in a legal matter, not
drinking coffee.


 [APPELLANT'S COUNSEL]: Okay. 



 Article 38.05 of the code of criminal procedure prohibits a judge from commenting on the
weight of the evidence. See Tex. Code Crim. Proc. Ann. art. 38.05 (Vernon 1979). However, a
violation of this article is forfeitable by inaction. See Moore v. State, 907 S.W.2d 918, 923 (Tex.
App.-Houston [1st Dist.] 1995, pet. ref'd). Appellant concedes in her brief that her trial counsel
neither made a specific objection to the court's comment, nor obtained a ruling, asked the court to
have the jury disregard its comment, or requested a mistrial. However, Appellant contends that the
error is fundamental in that it controverts the underlying purpose of Texas Rule of Evidence
103(a)(1) and violates Appellant's due process rights as a comment on the evidence. 

 In Blue v. State, 41 S.W.3d 129 (Tex. Crim. App. 2000), the court of criminal appeals held
the trial judge's statement to the venire that he preferred the defendant plead guilty tainted the
defendant's presumption of innocence and was fundamental error. Id. at 132. Blue is
distinguishable from the case at hand.

 Here, the trial judge's explanation does not rise to the level of fundamental error because he
did not express an opinion on the weight of evidence in Appellant's case. See, e.g., Rabago v. State,
75 S.W.3d 561, 563 (Tex. App.-San Antonio 2002, pet. ref'd). (7) Rather, the trial court merely
explained to the jury why they had been kept waiting. Even though, in its explanation to the jury,
the trial court also made reference to the fact that it had overruled Appellant's objection to
Appellant's grand jury testimony, such does not amount to a comment on the weight of the
testimony, but rather, its admissibility. To conclude otherwise would result in fundamental error
every time the trial court ruled on the admissibility of evidence in the jury's presence. Consequently,
we hold the trial judge's explanation, if erroneous at all, did not constitute fundamental error.

 Appellant further argues that the trial court's comment violated the underlying purpose of
Texas Rule of Evidence 103, which Appellant characterized as "to prevent a party . . . from having
to lodge an objection in front of the jury only to have the jury hear the court overrule it." When
interpreting criminal statutes, courts focus on the plain language of the text, for that is the foremost
indication of the underlying intent. See Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App.
1991). From our reading of the rule, it follows that its aim is judicial efficiency in determining
admissibility of evidence and the prevention of the suggestion of inadmissible evidence to the jury. 
 See Tex. R. Evid. 103(c) (emphasis added). While it may be a beneficial side effect of the rule that
a party will not have to make an objection in front of the jury, the text of the rule does not suggest
the same as the intended result. The language of the rule makes no reference to shielding the jury
from admissible evidence. As such, we cannot conclude that the trial court's informing the jury that
it ruled Appellant's grand jury testimony admissible undermined the purpose of Rule 103.

 As the error of which Appellant complains was not fundamental in nature, Appellant was not
excused from the requirement that she object to preserve the error, if any, for appellate review. 
Appellant concedes that she did not object to the trial court's comment. Therefore, she has waived
the issue on appeal. See Tex. R. App. P. 33.1. Appellant's third issue is overruled.


Conclusion

 Having overruled Appellant's issues two and three, we affirm the trial court's judgment.




 JAMES T. WORTHEN 

 Chief Justice



Opinion delivered March 31, 2004.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.














(PUBLISH)
1. These individuals are referred to collectively as "the group."
2. Carrier and Warren, who the record indicates were college-age individuals, are referred to collectively as
the "two boys."
3. "
Demon" is Gomez's nickname.
4. Garcia testified that she paid for the taxi with ten dollars she had stolen from Carrier's wallet.
5. At the hearing on Appellant's motion to suppress her confession, Dobbs testified that he had the
conversation with Appellant's sister, adding that he was not sure if Appellant's mother spoke much English. Dobbs
also testified that Appellant had been placed under arrest prior to being brought to the Tyler Police Station.
6. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
7. Since there is no majority opinion in Blue, it is not binding precedent. See Murchison v. State, 93
S.W.3d 239, 262 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd) (citing Pearson v. State, 994 S.W.2d 176, 177 n.
3 (Tex. Crim. App. 1999)). Even if it were, it would not affect our analysis. As Judge Keasler's concurring opinion
in Blue indicates, the trial court's remarks in Blue reasonably could be interpreted as a predetermination of Blue's
guilt, thus implicating the right to an impartial trial court. See Blue, 41 S.W.3d at 135-39 (Keasler, J., concurring). 
The trial court's comments in the instant case are not of this nature. Therefore, Blue would not apply to the facts of
this case, even if it were binding precedent. See Jasper v. State, 61 S.W.3d 413, 420-22 (Tex. Crim. App. 2001);
Blue, 41 S.W.3d at 129-135; Murchison, 93 S.W.3d at 262.