**Christina MARTINEZ, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 12–00–00246–CR.**

Court of Appeals of Texas, Tyler.

March 31, 2004.

Rehearing Overruled May 4, 2004.

Discretionary Review Refused Sept. 15, 2004.

Terrence W. Kirk, Austin, for appellant.

Michael Sandlin, Dallas, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and DeVASTO, J.

## OPINION

JAMES T. WORTHEN, Chief Justice.

Christina Martinez ("Appellant") appeals her conviction of capital murder, for which she received a mandatory life sentence. On original submission, Appellant raised three issues. *See Martinez v. State*, No. 12–00–00246–CR, 2001 WL 1654493, at * 1 (Tex.App.Tyler December 21, 2001) (not yet released for publication). In her first issue, Appellant contended that evidence of gang affiliation was improperly admitted. *Id.* at * 3. We reversed the trial court's judgment, holding that the relevance of the aforementioned gang evidence was outweighed by its prejudicial nature. *Id.* Concluding that Appellant had waived the issue, the court of criminal appeals reversed our holding and remanded the cause for our consideration of the remaining two issues. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App.2003). We affirm.

### BACKGROUND

On July 1, 1999, Appellant traveled to Lake Palestine with friends and acquain-

tances, Hersain Gomez ("Gomez"), Susana Arroyo ("Arroyo"), Armando Hinojosa ("Hinojosa"), Michael Thompson ("Thompson"), and Crystal A. Garcia ("Garcia").[1] The group traveled together in Hinojosa's car to Kiloland Park and spent the day drinking alcohol, smoking marijuana, swimming, listening to music, and dancing. That afternoon, the victim, Jeffrey Adam Carrier ("Carrier"), drove up in a blue Honda Civic. The passenger, Aaron Warren ("Warren"), exited the vehicle and inquired generally of the group if anyone knew where he could buy some marijuana. Warren was told that no one had any marijuana for him to purchase, but if he returned later that evening, they would go to Tyler with him and help him find a dealer. Garcia testified that after Warren and Carrier left Kiloland Park, the group had a discussion outside of her presence, which she later discovered involved a plan to rob the two boys, Carrier and Warren.[2] The general consensus was that the boys would be beaten up and their money taken. Later that evening, the two boys returned to Kiloland Park as instructed.

Hinojosa's car battery was dead. Warren, Carrier, and Thompson took Carrier's car to find jumper cables. While they were gone, the remaining members of the group, Garcia included, further discussed the plan to rob Warren and Carrier. At this point, Gomez stated that since the punishment was essentially the same for aggravated robbery, they might as well kill the two boys. Subsequently, Warren, Carrier, and Thompson returned and, with the help of a passerby in another vehicle, were able to jump-start Hinojosa's car. The group and the two boys left Kiloland Park in two cars. In one car, driven by Hinojosa, also rode Thompson, Gomez, and Garcia. In the other car, driven by Carrier, also rode Warren, Arroyo, and Appellant. The group and the two boys first went to Kilo's liquor store, where Thompson purchased beer, cigarettes, and a bag of Cheetos. The group and the two boys then left the liquor store in the same cars in which they had arrived.

According to Garcia's testimony, the group in Hinojosa's car further discussed the plan, which was to separate the two boys prior to robbing them. Garcia testified that the fabricated reason to be given the two boys in order to separate them would be that Thompson's uncle would sell them the marijuana, but did not like large groups of people at his house. Therefore, Hinojosa, Thompson, and one of the boys would leave the rest of the group and Carrier, knock on a stranger's door, purportedly that of Thompson's uncle, and inquire about purchasing marijuana. According to Garcia, Gomez again suggested that they kill the two boys. The two cars stopped on a street south of the Tyler city limits, where Gomez and Thompson left the group momentarily to urinate. When they returned, Carrier and Warren were told that they had passed the street on which Thompson's uncle's house was located and that they needed to double back. The apparent purpose of telling the two boys this was to find a more remote street.

The cars, containing the same occupants, drove on and turned down County Road 122, also known as Skidmore Lane. Shortly thereafter, the two cars stopped. Hinojosa and Thompson left with Warren in Hinojosa's car in search of Thompson's fictitious uncle's house. The rest of the group, including Appellant, remained with Carrier by his car. However, before Thompson

---

1. These individuals are referred to collectively as "the group."

2. Carrier and Warren, who the record indicates were college-age individuals, are referred to collectively as the "two boys."

and Warren departed, Gomez instructed Garcia to retrieve a knife from the passenger-side, seat-back pocket of Hinojosa's car and to use it to puncture the tires on Carrier's car. Garcia did as she was told and, unbeknownst to Carrier, used the knife to puncture the rear passenger-side tire of Carrier's car. The tire quickly deflated. Garcia handed the knife to Appellant and exclaimed to Carrier, "Say man, your tire is flat!"

Carrier, who was sitting in the driver's seat, exited his car and retrieved the spare tire and a pouch containing a tire iron and jack assembly from the trunk. Carrier then proceeded to begin changing the rear, passenger-side tire. While Carrier was kneeling down to remove the flat tire, Gomez picked up the spare tire, held it over Carrier for a moment, then threw the tire down at Carrier's head. The tire struck Carrier, but he was not knocked to the ground. Carrier proceeded to defend himself against Gomez's attack. During the fight, Carrier was apparently getting the best of Gomez until Arroyo hit him twice with the car jack. Carrier fell to the ground and Gomez and Arroyo continued to beat him. At one point, Carrier struck Arroyo in the leg. Angered that Carrier had hit Arroyo, who was her cousin, Garcia kicked Carrier as he lay on the ground. Garcia then took the tire iron that lay by the car and hit Carrier multiple times in the shoulder with it. It is undisputed that Appellant took no part in the actual beating of Carrier.

Gomez and Arroyo then dragged Carrier, still conscious, from the roadside into the nearby wooded area. Garcia proceeded to steal items from Carrier's car while Appellant attempted to wipe fingerprints from the car's exterior. Subsequently, Gomez called Garcia to the woods and Arroyo informed her that Carrier had given them his wallet. Garcia returned to the car only to be called to the edge of the woods once again. This time, Gomez told her to get the knife for him. Garcia retrieved the knife from Appellant, who, according to Garcia, said, "Here, hand this to Demon." [3] Garcia then gave the knife to Gomez. Gomez used the knife to stab Carrier to death.

Subsequently, Hinojosa drove up in his car alone. Garcia and Appellant got into the car with him. Garcia and Appellant informed Hinojosa that Gomez and Arroyo had just killed Carrier. As Gomez and Arroyo approached, Garcia inquired as to the whereabouts of the knife, which she feared, if left behind, could be traced to her father. Hinojosa drove off to go pick up Thompson, leaving Gomez and Arroyo to search for the knife. When they reached Thompson and Warren, Garcia informed Thompson that Gomez had killed Carrier. Hinojosa told Thompson, who was angered by the news he had just received, to get into the car. Warren walked around to the other side of the car. However, before Warren could get into the car, Hinojosa sped off, leaving Warren, who was still unaware that his friend was dead. Upon returning to Carrier's car, the three picked up Gomez and Arroyo and proceeded to Thompson's house. During the drive to Thompson's house, Gomez expressed his willingness to go back and kill Warren as well so that there would not be any witnesses. However, despite Gomez's wishes, Hinojosa drove on to Thompson's house.

According to Garcia's testimony, once the group reached Thompson's house, they discussed how they might cover up the crime. Gomez threatened the group, saying that if anyone "snitched," he would kill them. The group then left Thompson at

---

**3.** "Demon" is Gomez's nickname.

his home and proceeded to Appellant's house, where Garcia and Appellant were dropped off. Appellant and Garcia ultimately spent the night at Appellant's sister's house. Once at Appellant's sister's house, Appellant and Garcia contacted two male friends, who later arrived by taxi,[4] and spent the night. Appellant and Garcia were apprehended the next day. The police also arrested Hinojosa and Thompson. Gomez and Arroyo are still at large and believed to be in Mexico.

Appellant invoked her right to counsel. Subsequently, Appellant's mother and sister came to the Tyler Police Station where Appellant was being held and spoke to David Dobbs ("Dobbs"), a prosecutor with the Smith County District Attorney's Office. Appellant's sister testified that Dobbs told them about another murder case where the people who talked to the police and helped them in the beginning got off lighter than the people who had refused to talk. Yet, Appellant's sister conceded that Dobbs did not make them any promises. Dobbs testified that Appellant's sister inquired as to whether if Appellant cooperated with law enforcement, she would be let out of jail or could otherwise improve her situation.[5] Dobbs testified that he told Appellant's sister that he could make no promises because he did not know what role Appellant had in what had occurred. Dobbs continued,

> I told her that her sister would have to make the decision as to whether or not she cooperated, that I had seen cases in the past where people had had less roles in a case, and they had cooperated, and when it came down to the trier of fact

deciding what had happened to them, that it would help them.

> I had seen cases where people had cooperated a whole lot and their role was very strong in the offense, and it made no difference to them. That was a decision that they had to make. We didn't know what her role was, and there was nothing that we could do in terms of making her any kind of promise.

> I told them that . . . her sister was going to have to decide whether she cooperated without any type of a promise or benefit from us because we couldn't make any type of promise . . .

Dobbs further testified that following his conversation with Appellant's sister, she and Appellant's mother approached Tyler Police Detective Bobby Van Ness ("Van Ness") and asked him if they could speak with Appellant.

Appellant was permitted to speak with her mother and sister. Subsequently, Appellant's mother told Van Ness that Appellant wanted to speak with police. At the beginning of the interview between police and Appellant, Van Ness felt that Appellant did not want to talk to them and was not willing to waive her right to an attorney. As Van Ness began to leave the interrogation room, Dobbs entered and stated that Appellant needed to be taken to jail. Appellant's mother urged Appellant to cooperate. Appellant then indicated that she wished to speak with police. Appellant was advised of her rights, waived her rights, and stated that she had asked to speak with the police after initially requesting an attorney.

---

4. Garcia testified that she paid for the taxi with ten dollars she had stolen from Carrier's wallet.

5. At the hearing on Appellant's motion to suppress her confession, Dobbs testified that he had the conversation with Appellant's sis-

ter, adding that he was not sure if Appellant's mother spoke much English. Dobbs also testified that Appellant had been placed under arrest prior to being brought to the Tyler Police Station.

Appellant was charged with capital murder of Carrier as a party to the offense. The jury found Appellant guilty of the capital murder of Carrier and Appellant received a mandatory life sentence.

### MOTION TO SUPPRESS CONFESSION

■ In her second issue, Appellant argues that the trial court erred in refusing to suppress her videotaped confession. Specifically, Appellant contends that the State improperly used Appellant's mother and sister to convince Appellant to give a confession after she had invoked her right to counsel.

We review a trial court's ruling on a motion to suppress for abuse of discretion. *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Curry v. State,* 965 S.W.2d 32, 33 (Tex.App.-Houston [1st Dist.] 1998, no pet.). In reviewing the trial court's ruling, we apply a bifurcated standard of review. *See Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000); *Hernandez v. State,* 957 S.W.2d 851, 852 (Tex.Crim.App.1998). We give almost total deference to the trial court's determination of historical facts, while conducting a de novo review of the trial court's application of the law to those facts. *See Carmouche,* 10 S.W.3d at 327. The trial court is the exclusive finder of fact in a motion to suppress hearing, and as such, it may choose to believe or disbelieve any or all of any witness's testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). Furthermore, when, as in the instant case, "the trial court fails to file findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000). If the trial judge's decision is correct on any theory of

law applicable to the case, the decision will be sustained. *Id.* at 856.

■ Once a suspect has invoked his right to counsel, all interrogation by the police must cease until counsel is provided or until the suspect himself reinitiates conversation. *See Dinkins v. State,* 894 S.W.2d 330, 349 (Tex.Crim.App.1995). Our analysis is twofold. First, we determine whether the accused actually invoked his right to counsel. *See Smith v. Illinois,* 469 U.S. 91, 95–97, 105 S.Ct. 490, 492–94, 83 L.Ed.2d 488, 494 (1984). Second, we examine how police obtained the statement. Statements obtained after the suspect has invoked his right to counsel are admissible only if the court finds that the accused initiated the discussion and that he knowingly and intelligently waived the rights he had invoked. *Id.,* 469 U.S. at 95, 105 S.Ct. at 492–93. The State has the burden of establishing a valid waiver. *See Upton v. State,* 853 S.W.2d 548, 553 (Tex.Crim.App.1993). The statement is admissible if all of these factors are met. *See Etheridge v. State,* 903 S.W.2d 1, 18 (Tex.Crim.App.1994).

Appellant cites to *Kreyssig v. State,* 935 S.W.2d 886 (Tex.App.-Texarkana 1996, pet. ref'd) as the only case on point concerning her second issue. Kreyssig was arrested upon suspicion that he committed murder and invoked his right to counsel. *Id.* at 887. A few hours later, Kreyssig's stepfather came to the sheriff's office. *Id.* Kreyssig's stepfather asked to speak to a sheriff's deputy, who told Kreyssig's stepfather that three other persons who were also arrested implicated Kreyssig as having masterminded the murder. *Id.* at 888. The deputy further related to Kreyssig's stepfather that because Kreyssig had requested an attorney, the police could not talk to him. *Id.* Kreyssig's stepfather asked what would be the best thing for Kreyssig to do, to

which the deputy responded, "[I]t would be in the boy's best interest to talk to us and tell us his side of the story. We would be glad to listen." *Id.* The deputy elaborated that the police could not talk to Kreyssig unless he initiated the contact and sent a note stating that he wanted to waive his right to an attorney. *Id.* The deputy then made arrangements for Kreyssig to call the front desk, an area away from the deputy's office, and talk with his stepfather. *Id.* Later that morning, Kreyssig sent a handwritten, signed note to the deputy indicating that he wanted to talk. *Id.* He was brought to the deputy's office, was again read his *Miranda*[6] warnings, signed a form waiving his rights, stated that he understood such rights, and gave the deputy a written statement detailing his involvement in the murder. *Id.*

As in the case at hand, neither party in *Kreyssig* disputed that Kreyssig clearly expressed his desire for an attorney. *Id.* at 889. The court of appeals noted that police may not threaten, trick, or cajole an accused into waiving his constitutional rights. *Id.* Yet, concluding that there was no evidence that Kreyssig was tricked or cajoled into waiving his rights, the court held as follows:

> [The deputy's] conversation with [Kreyssig's stepfather] does not constitute state action. [The Deputy] did not initiate contact with [Kreyssig's stepfather], nor did he request that [Kreyssig's stepfather] perform a specific task or function. There is no indication that [the deputy] intended for [Kreyssig's stepfather] to act on his statement or any indication that [Kreyssig's stepfather] actually followed [the deputy's] advice. [Kreyssig's stepfather's] actions were those of a private person.
>
> . . . .

Even if [Kreyssig's stepfather] persuaded Kreyssig to waive his earlier request for counsel, his actions did not constitute police interrogation.

*Id.* at 889–90.

Here, the record, viewed in a light most favorable to the trial court's ruling, reflects that Appellant's mother and sister initiated contact with Dobbs. There is no indication that Dobbs requested either Appellant's mother or sister to perform a specific task or function. Furthermore, there is no indication that Dobbs intended for Appellant's mother or sister to act on his behalf.

Appellant argues that *Kreyssig* is distinguishable from the instant case because "we know what Appellant was told [as to] what . . . Dobbs had said." The fact that the substance of the conversation between Dobbs and Appellant's mother and sister may have been related to Appellant is immaterial. The court of appeals' analysis in *Kreyssig* concerned whether police had threatened, tricked, or cajoled Kreyssig into waiving his constitutional rights. *Id.* 889. Thus, the proper analysis centers upon whether Dobbs either requested that Appellant's mother or sister perform a specific task or function, or whether there is any evidence that he intended for Appellant's mother or sister to act on his statements.

However, Appellant further argues that the "only logical inference that can be drawn is that the deputy hopes for the relative to convey the advice to the defendant." Yet, viewing the evidence, as we must, in a light most favorable to the trial court's ruling, there is no indication that Appellant was either was tricked or cajoled into waiving her rights. Further, the record does not reflect that Dobbs intend-

---

**6.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ed that Appellant's mother or sister act on his behalf in any manner. Absent such evidence, we cannot conclude that the actions of Appellant's mother and sister amounted to state action, but rather, conclude that such actions were those of private persons. Accordingly, since the record reflects both that Appellant initiated the discussion with police and that she knowingly and intelligently waived the rights she had invoked, we hold that the trial court did not abuse its discretion in denying Appellant's motion to suppress. Appellant's second issue is overruled.

### TRIAL COURT'S COMMENTS TO JURY

■ In her third issue, Appellant argues that the trial court erred by informing the jury that it had overruled Appellant's objection to the State's attempt to offer Appellant's grand jury testimony, which had occurred outside the jury's presence. The trial court's comments to which Appellant refers are as follows:

> Jurors, I like to keep you informed as much as I can of what's taken place. We brought you in about 35 minutes later than what I told you I would. Remember what I said, as a trial progresses, points of law come up about whether something is admissible or not, and I have to do that outside the presence of the jury.
>
> Please be assured that while you were in there twiddling your thumbs, we were pressing ahead to get you back in as quickly as possible.
>
> Now let me explain one thing. The State has indicated that they next wish to present grand jury testimony of the defendant. The defendant's counsel objected to this, and it was overruled.
>
> Now, the way that this is done, the grand jury testimony is usually in the form of—

[APPELLANT'S COUNSEL]: May we approach the bench, please?

THE COURT: Yes.

(At the bench, on the record.)

[APPELLANT'S COUNSEL]: And I was in the middle of—I just didn't want—I didn't think it would be proper for the Court to indicate the purpose of the hearing or what the ruling was.

THE COURT: No, I'm not. I was just going to tell them that we were involved in a legal matter, not drinking coffee.

[APPELLANT'S COUNSEL]: Okay.

■ Article 38.05 of the code of criminal procedure prohibits a judge from commenting on the weight of the evidence. *See* TEX.CODE CRIM. PROC. ANN. art. 38.05 (Vernon 1979). However, a violation of this article is forfeitable by inaction. *See Moore v. State*, 907 S.W.2d 918, 923 (Tex. App.-Houston [1st Dist.] 1995, pet. ref'd). Appellant concedes in her brief that her trial counsel neither made a specific objection to the court's comment, nor obtained a ruling, asked the court to have the jury disregard its comment, or requested a mistrial. However, Appellant contends that the error is fundamental in that it controverts the underlying purpose of Texas Rule of Evidence 103(a)(1) and violates Appellant's due process rights as a comment on the evidence.

In *Blue v. State*, 41 S.W.3d 129 (Tex. Crim.App.2000), the court of criminal appeals held the trial judge's statement to the venire that he preferred the defendant plead guilty tainted the defendant's presumption of innocence and was fundamental error. *Id.* at 132. *Blue* is distinguishable from the case at hand.

Here, the trial judge's explanation does not rise to the level of fundamental error because he did not express an opinion on the weight of evidence in Appellant's case. *See, e.g., Rabago v. State*, 75 S.W.3d 561,

563 (Tex.App.-San Antonio 2002, pet. ref'd).[7] Rather, the trial court merely explained to the jury why they had been kept waiting. Even though, in its explanation to the jury, the trial court also made reference to the fact that it had overruled Appellant's objection to Appellant's grand jury testimony, such does not amount to a comment on the weight of the testimony, but rather, its admissibility. To conclude otherwise would result in fundamental error every time the trial court ruled on the admissibility of evidence in the jury's presence. Consequently, we hold the trial judge's explanation, if erroneous at all, did not constitute fundamental error.

■ Appellant further argues that the trial court's comment violated the underlying purpose of Texas Rule of Evidence 103, which Appellant characterized as "to prevent a party ... from having to lodge an objection in front of the jury only to have the jury hear the court overrule it." When interpreting criminal statutes, courts focus on the plain language of the text, for that is the foremost indication of the underlying intent. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App. 1991). From our reading of the rule, it follows that its aim is judicial efficiency in determining admissibility of evidence and the prevention of the suggestion of *inadmissible* evidence to the jury. *See* TEX.R. EVID. 103(c) (emphasis added). While it may be a beneficial side effect of the rule that a party will not have to make an objection in front of the jury, the text of the rule does not suggest the same as the intended result. The language of the rule makes no reference to shielding the jury from admissible evidence. As such, we cannot conclude that the trial court's informing the jury that it ruled Appellant's grand jury testimony admissible undermined the purpose of Rule 103.

■ As the error of which Appellant complains was not fundamental in nature, Appellant was not excused from the requirement that she object to preserve the error, if any, for appellate review. Appellant concedes that she did not object to the trial court's comment. Therefore, she has waived the issue on appeal. *See* TEX. R.APP. P. 33.1. Appellant's third issue is overruled.

### CONCLUSION

Having overruled Appellant's issues two and three, we *affirm* the trial court's judgment.

---

7. Since there is no majority opinion in *Blue*, it is not binding precedent. *See Murchison v. State*, 93 S.W.3d 239, 262 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (citing *Pearson v. State*, 994 S.W.2d 176, 177 n. 3 (Tex.Crim. App.1999)). Even if it were, it would not affect our analysis. As Judge Keasler's concurring opinion in *Blue* indicates, the trial court's remarks in *Blue* reasonably could be interpreted as a predetermination of Blue's guilt, thus implicating the right to an impartial trial court. *See Blue*, 41 S.W.3d at 135–39 (Keasler, J., concurring). The trial court's comments in the instant case are not of this nature. Therefore, *Blue* would not apply to the facts of this case, even if it were binding precedent. *See Jasper v. State*, 61 S.W.3d 413, 420–22 (Tex.Crim.App.2001); *Blue*, 41 S.W.3d at 129–135; *Murchison*, 93 S.W.3d at 262.