

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,413

### EX PARTE CHRISTINA MARTINEZ, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM SMITH COUNTY

MEYERS, J., delivered the opinion of the Court, in which PRICE, WOMACK, KEASLER, and HERVEY, JJ., joined. KELLER, P.J., and JOHNSON and COCHRAN, JJ., concurred.

### O P I N I O N

Applicant was charged with capital murder as a party to the offense. A jury found her guilty, and she was automatically sentenced to life imprisonment. On direct appeal, the Twelfth Court of Appeals held that her trial counsel ("Counsel") had sufficiently objected to all gang-related evidence to preserve appeal and that the trial court erred when it overruled objections to all gang-related evidence, which was irrelevant and prejudicial. *Martinez v. State* (*Martinez I*), 147 S.W.3d 404 (Tex. App.—Tyler 2001). However, on discretionary review, this Court determined that Counsel did not properly preserve his

objection, and we reversed the court of appeals. *Martinez v. State* (*Martinez II*), 98

S.W.3d 189 (Tex. Crim. App. 2003). Upon remand to consider the remaining issues, the

court of appeals affirmed Applicant's conviction and sentence. *Martinez v. State*

(*Martinez III*), 147 S.W.3d 412 (Tex. App.—Tyler 2004, pet. ref'd). Applicant filed an

application for writ of habeas corpus, claiming that she was denied effective

representation when her Counsel failed to object to the introduction of all gang-related

evidence. An evidentiary hearing was held on the writ application. The trial court

entered findings of fact and conclusions of law recommending that relief be denied. We

filed and set this application for writ of habeas corpus. We will hold that Counsel was

not ineffective, and we will deny relief.

## I. FACTS[1] AND PROCEDURAL HISTORY

Appellant was at the lake with friends and acquaintances (Hersain Gomez, Susana

Arroyo, Armando Hinojosa, Michael Thompson, and Crystal Garcia)[2] when the victim

(Jeffrey Adam Carrier) and his passenger (Aaron Warren) approached them and inquired

about obtaining marijuana. The group advised the boys[3] to return later, when they would

help them. The group discussed a plan to rob the boys and also briefly discussed whether

---

[1]For a more detailed version of the facts of the crime, see *Martinez I*, 147 S.W.3d at 406-09; *Martinez II*, 98 S.W.3d at 191; and *Martinez III*, 147 S.W.3d at 413-17.

[2]These individuals are referred to collectively as "the group." Garcia and Gomez pled guilty to capital murder, and Arroyo was found guilty of the same. Hinojosa and Thompson were convicted of capital murder as a party to the offense. All defendants received an automatic life sentence, except for Garcia who was sentenced to 20 years as a juvenile.

[3]The victim and his passenger are referred to as "the boys."

to murder them. Upon their return, the group separated the boys in accord with their plan, and the attack on the victim began. The victim was eventually subdued and dragged into the woods. The beating continued, and the victim was stabbed with a knife.

Applicant was charged with capital murder as a party to the offense, where the State did not seek the death penalty. She retained Counsel.

**A. Trial**

The jury convicted Applicant of capital murder as a party to the offense, and she received a mandatory life sentence. Central to Applicant's claim of ineffective assistance is the gang-related evidence introduced by the State. Other key evidence at trial included Garcia's extensive testimony about the crime, and to corroborate that testimony,[4] the State relied on a videotaped statement made by Applicant to the police and her grand jury testimony.[5]

*Gang-related evidence*: Prior to trial, Counsel filed a motion in limine asking to

---

[4]Garcia was an accomplice as a matter of law. *See Burns v. State*, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985) (stating that a person who has been indicted for the same offense is an accomplice witness as a matter of law). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. The accused's presence in the accomplice's company before, during, and after the commission of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). A defendant's confession may be sufficient to corroborate the testimony of an accomplice, if proof of the confession does not depend on the testimony of the accomplice. *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990).

[5]The investigators, detectives, criminologist, medical examiner, and police involved in the case also testified.

exclude any evidence suggesting that Applicant and her co-defendants were in a gang. The State represented that it would introduce evidence that Applicant associated with gang members, some of whom were involved in the murder at issue. The State also asserted that it would call a detective to testify as a gang expert about gang activity in general and the Northside Crips in particular.[6] It argued that such evidence was relevant to show that Appellant should have known of her associates' violent tendencies and, thus, should have anticipated that death would occur as a result of carrying out their plans. The judge overruled the motion and limited the admissibility of the gang evidence to the purpose of determining whether Applicant should have anticipated a murder.

At trial, Counsel objected to the first pieces of gang-related evidence offered by the State. During direct examination of its key witness, Garcia, the State aimed to establish that Applicant was affiliated with gang members by introducing two photographs. Each showed Applicant standing next to a man with no connection to the crime; the man had one arm around Applicant and the other exhibiting a gang sign. Counsel objected to the introduction of the photographs on the grounds of relevance and prejudice. The judge overruled the objections and admitted the evidence. Counsel also asked to take Garcia on voir dire with respect to the photographs, but the judge denied that request. Garcia then explained that the man in the photograph associates with the Bloods gang, and the gang sign depicted meant "crip killer."

---

[6]The State did not call the detective to testify.

The State continued to question Garcia about gang-related topics. Garcia testified that all six of the defendants associated with gangs, several with the Northside Crips specifically. She also showed the jury her three-dot tattoo, which represented the phrase "mi vida loca" or "my crazy life." Two other defendants, who too were associated with gangs, had the same tattoo, although Garcia admitted that having the tattoo did not necessarily mean that the person is in a gang. Further, Garcia demonstrated a gang hand sign, and she explained that females are free to hang out with rival gangs without problems, unlike males who generally stay with their particular gang. The only objection by Counsel to the evidence of gang affiliation (presented after the two photographs) was one challenging Garcia's expertise on gangs.

During its closing argument, the State highlighted Applicant's alleged gang involvement:

> You know, robberies are violent. Gang members are violent. And you heard the gang testimony, and you can believe that she is an associate or a member of the Northside Crips. I think it's pretty clear or Crystal Garcia made it real clear that they don't carry cards saying, "I'm a gang member. I'm a member of the Northside Crips. I get a special discount at the movies.["]
> It's clear. You've got a gang member throwing signs with his arm around her neck. It's as clear as day that she's a gang member, and gang members are violent.
> And people who talk about killing their victims after robbing the victims are violent. And when people use knives and weapons and hit people over the head with tire jacks, those are violent people. And people who give the murder weapons to a man named Demon[7] is a violent act.
> And it shows her knowledge, and it shows her knowledge after seeing all that she had seen, and she should have anticipated that death would occur. Real

---

[7] "Demon" is Gomez's nickname.

simple. She should have anticipated death would occur. And she's guilty of capital murder.

*Garcia's Additional Testimony*: Apart from the gang-related evidence, Garcia testified extensively as to the crime generally and Applicant's involvement specifically. She explained that the group, of which Applicant was a part, developed a plan to beat up and rob the boys when they returned to buy marijuana,[8] and that Gomez later suggested, once in Applicant's presence and again outside of her presence, that they kill the boys because punishment was essentially the same for aggravated robbery. When the boys returned, the group divided into two cars. Arroyo and Applicant rode with the boys in the victim's car while the others rode in Hinojosa's car.

When the two cars finally stopped on a remote road, the boys were told that Thompson would take the passenger to his (fictitious) uncle's house to buy marijuana. Hinojosa, Thompson, and the passenger then drove away, leaving the other individuals behind with the victim. At that time, Garcia punctured one of the tires of the victim's car pursuant to earlier directions from Gomez, directions of which Applicant was not aware. The attack on the victim began as he prepared to fix the flat tire. Applicant never physically touched the victim, but she witnessed Gomez beat him while Arroyo struck him with a car jack. After Gomez and Arroyo dragged the victim into the woods to continue the beating, Garcia stole things from inside the vehicle while Applicant

---

[8]According to Garcia's testimony, no one opposed the plan to rob the boys when Gomez brought up the idea, but the only person that expressly agreed to it was Arroyo. Also, Garcia stated that they never planned to actually help the boys obtain marijuana.

attempted to conceal her involvement by wiping fingerprints from the car's exterior.[9]

Also, Applicant had possession of the knife that had been used to deflate the tire of the

victim's car, and when asked for the knife by Gomez, Applicant handed it to Garcia with

instructions to give it to Gomez, who subsequently used it to stab the victim in the heart.

Subsequently, Hinojosa, Garcia, and Applicant left to find Thompson, who was

still with the passenger. They picked him up about a mile away and left the passenger

there. They then returned to collect Gomez and Arroyo, who were congratulating

themselves on the murder. Arroyo remarked, however, that Garcia and Applicant "didn't

do shit," and Applicant said she was glad she "didn't do nothing." Once reunited, the

group discussed how they might cover up the crime. Afterwards, still without calling the

police or 9-1-1, Applicant returned to her home. Garcia accompanied Applicant, who

rinsed their clothes and shoes in the sink. The girls later called a couple of friends to

come over, and they paid for the taxi with ten dollars that had been taken from the victim.

Garcia's account of the murder did not go unchallenged by the defense. Counsel

brought out that Garcia had written a letter from the juvenile detention center stating "the

wrong people were locked up," including Applicant because she had not physically killed

the victim. Counsel also established that, while detained, Garcia told a young man that

Applicant "didn't have anything to do with this." In addition, Counsel questioned

Garcia's potential bias—although Garcia denied there was any deal in exchange for her

---

[9]During this time, Garcia went into the woods and demanded that the victim give her his
wallet.

testimony, Counsel introduced evidence that the decision of whether to try Garcia as an adult had been deferred until after her testimony in Applicant's case, and the prosecution admitted that they would take into account the totality of her cooperation in this case when determining her case's disposition. Finally, Counsel emphasized Garcia's lack of credibility in his closing statement, highlighting that she was not completely consistent in her testimony.

*Applicant's Videotaped Statement*: The day after the murder, Applicant made a statement to police, and the video recording of the interview was played for the jury at trial. During the interview, Applicant denied that there had been any plan to rob the boys or murder anyone.[10] However, there were many inconsistences to Applicant's account, and as the interview progressed, she changed her story and ultimately admitted to not being truthful during the initial portion of the interview. For example, Applicant claimed not to know one co-defendant's name, but she later remembered his proper name as well as his nickname. Also, she originally stated that she was using the bathroom in the woods when the fight by the car occurred, but she subsequently admitted that she was, in fact, a nearby witness to the altercation. Similarly, she initially denied going near the victim's car when the victim was taken into the woods but ultimately confessed to wiping down the car. In addition, Applicant denied early on that she had heard screaming from the

---

[10] Interestingly, during the interview, Applicant did not admit that there was talk of killing the boys, did not mention going into the woods and seeing the victim's body, did not admit seeing the objects or weapons being used against the victim, and did not confess to turning over the murder weapon. These details would be addressed in Applicant's grand jury testimony.

woods, but she finally conceded that she indeed heard the victim begging for his life. The

State, in its closing argument, stressed Applicant's dishonesty during the police interview:

> . . . The first 75 pages that you got to read along with, the first, whatever it amounts to, three-quarters of this video she denies, denies, denies.
> She didn't know anything about what was going on. She had no idea about this robbery plan. She had no idea what had happened to Jeffery Adam Carrier because when she came out of the woods, everyone was mysteriously gone. She had no idea what was going on.
> And then suddenly about to Page 75, it starts coming out, and it gets pulled out, like pulling teeth. And finally, she says, "Yeah, I did hear the victim screaming. I did hear Jeffery Carrier screaming, begging for his life."
> And then it comes out, "Well, yeah, I actually did see the fight, also." And then, "Well, yes, I did wipe down the prints, fingerprints off that car. Yeah, I did do that," but there is never an admission, never, not one time is there an admission on this police video that there was ever a plan to rob Jeffery Adam Carrier . . . .

Also during the video recording, Applicant denied knowing of any violent criminal

acts by the other defendants. But she claimed that she was afraid of some individuals in

the group, particularly Gomez. Applicant explained that she did not want to look in the

woods or elsewhere for the others because she was afraid of what she might see.

Additionally, she asserted that she was not aware that anything was going to happen, but

she was scared because she "had seen a lot of stuff happen" and "thought the worst."

When asked about the plan to buy marijuana, Applicant stated that she and Susie

rode in the victim's car after leaving the lake because the two of them were going to take

the boys to purchase it. This prompted the investigator to question why, if that was the

plan, did they not provide driving directions to the boys. Applicant responded that, after

the passenger got out of the victim's car and got into Hinojosa's car, she assumed that the

other car was going to buy the marijuana.[11]

*Applicant's Grand Jury Testimony*: The State offered into evidence a copy of Applicant's grand jury testimony in which Applicant further described the events and circumstances surrounding the murder. She explained that she was present when the victim was initially struck by the tire and then the car jack, and although she turned away so that she could not see, she heard fighting. When it became quiet, she turned back around and discovered that the action had moved into the woods. Upon hearing screaming coming from that direction, she walked into the woods to investigate. There, she witnessed Gomez and Arroyo beating the victim as he screamed and begged for his life. Applicant then returned to the car and wiped her prints from its exterior to remove evidence of her presence at the scene. At that time, Gomez came out of the woods and said, "Give me the knife."[12] Applicant admitted that, even though she had just seen him beating the victim, she complied with Gomez's demand, after which he returned to the woods.[13] Applicant also testified that she took the victim's cell phone from his car before they "ever got anywhere"; that she found a watch in her purse but she had not put it there;

---

[11]During her grand jury testimony, Applicant explained that, of the group, she, Arroyo, and Garcia would normally buy marijuana, but Thompson used to know who sold it.

[12]Applicant testified that she had originally taken the paring-type knife from Garcia's house a few days prior. On the day of the crime, the group had been playing with the knife while at the lake, so Gomez was aware that Applicant had it.

[13]There is some discrepancy between Applicant's grand jury testimony and Garcia's testimony as to whether Applicant gave the knife directly to Gomez or, instead, gave it to Garcia with instructions to hand it to Gomez. Regardless, the evidence supports that Applicant was aware of Gomez's demand, and she complied with it.

and that, when she returned home the night of the murder, she washed her jeans in case there was blood on them.

Importantly, Applicant admitted that Gomez had, in fact, proposed that they rob the boys, but she maintained that Gomez said they would do so only if everyone agreed. Because she had expressed disagreement with the plan, she did not believe that the robbery was going to occur, much less a murder. When asked directly about her suspicions of what was to occur when the boys returned, Applicant stated that she did suspect that something would happen, but she was very drunk and confused.

> A GRAND JUROR: Christina, I have a hard time trying -- trying to believe -- you know, when you're in a group of people doing whatever you're doing, whether you're going to a game or whatever, you're not -- when the car is split up, and everybody gets in two separate cars, you're not asking like, "You know, what's going on? What's going down?"
>
> THE WITNESS: Yeah. That's why I asked them, I said, "Why" -- I said, "Where is -- where are they going?" And he said, "Well, they're going to buy some -- they're going to buy some weed from [Thompson's] uncle's house." So I figured, well, we're just going to stay here and wait for them.
>
> A GRAND JUROR: But don't you -- I mean, when -- you knew what was going to happen with -- what [Gomez] and [Arroyo] was going to -- I mean, you had to suspect something was going to happen.
>
> THE WITNESS: Well, I --
>
> A GRAND JUROR: You had to know.
>
> THE WITNESS: Yeah, I kind of suspected something, but I was -- I was drunk. . . . I knew, and then I didn't know, and then I was just --
>
> Q (By [the State]). You knew, but you didn't really want to -- the reality is you really didn't want to know what was going down.

A. Well, it was just like I knew, and then I was like, well, no, and then I -- it was just -- it was very confusing. I mean, I wasn't sure they were going to do it, and then at times I would think they were going to do it, and I just wasn't sure. I didn't know.

As she had in the videotaped interview, Applicant claimed that she had been afraid of Gomez. She admitted that it crossed her mind to stop Gomez and Arroyo in the woods, but she did not do so because they were all bigger than she, and that she was afraid for her own life. Applicant also explained that she handed Gomez the knife because she was afraid of what he would have done had she not complied with his request. She further testified that Gomez threatened the group to keep quiet about the murder: "I'll kill any of y'all if I ever hear that y'all say anything about this." Still, while Applicant contended that she had not been hanging out with Arroyo recently because she had become "really violent" and was "always trying to get into something," she stated that she knew Gomez to be calmer (e.g., she had seen him in fights before but not recently).

**B. Twelfth Court of Appeals**

On direct appeal to the Twelfth Court of Appeals, Applicant raised three issues. *Martinez I*, 147 S.W.3d at 404. For the first, Applicant argued that the evidence of gang affiliation was improperly admitted, and the court of appeals agreed. The court, in a footnote, stated that Counsel had sufficiently objected to all gang-related evidence and preserved appeal when he had objected to the gang-related evidence upon its initial

introduction (i.e., the photographs).[14] Also, the court determined that the trial court erred when it overruled Counsel's objections to all gang-related evidence because such evidence was irrelevant, and if it was relevant, its relevance was substantially outweighed by its prejudicial nature.

The court of appeals then held that Applicant was harmed by Counsel's error because the gang-related evidence established the element of knowledge. Analyzing the case under the harmless-error standard,[15] the court explained that, although the gang-related evidence was only a small percentage of the evidence introduced at trial, its importance was great as it related to the knowledge element of the crime. The court also highlighted that the State emphasized the erroneously admitted evidence during its closing argument in an attempt to cause the jury to assume that the Crips were generally known to engage in violent activities when no such evidence was in the record. Thus, it believed "the likelihood that the jury placed a considerable amount of weight on [Applicant's] gang association to be undeniable." *Id.* at 411. The court remanded the case for a new trial.[16]

### C. Court of Criminal Appeals

---

[14]"By objection to the gang-related evidence upon its initial introduction, [Applicant] preserved error and was not required to iterate this objection." *Martinez I*, 147 S.W.3d at 408 n.5.

[15]Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *see Martinez I*, 147 S.W.3d at 411.

[16]Based on its evaluation of the first issue, the court of appeals did not think it necessary to address the second and third issues.

We granted Applicant's petition for discretionary review. *Martinez II*, 98 S.W.3d at 192. We held that Counsel failed to properly object to all gang-related evidence and, thus, reversed the court of appeals. We noted that, while Counsel properly objected to the introduction of the two photos specifically, he failed to object to the other gang-related evidence. "[T]he objections to the challenged photos did not preserve error for all other gang[-]related evidence" because they were objections directed specifically at the two photographs. Also, Counsel's pre-trial motion in limine, which referred to the gang-related evidence generally, did not preserve the issue for appeal. *Id.* at 193. We did not comment on the court of appeals's harm analysis.

We remanded the case to the court of appeals for determination of Applicant's other two grounds for appeal, and the court of appeals affirmed Applicant's conviction and sentence. *Martinez III*, 147 S.W.3d at 420.[17]

### D. Habeas Application

Applicant filed a writ of habeas corpus, asserting that Counsel's failure to object was below the standard of professional conduct and that, but for the deficient conduct, she would have received a new trial as ordered by the court of appeals.

---

[17]The court of appeals held that (1) the trial court did not abuse its discretion in denying the motion to suppress Applicant's videotaped confession and (2) Applicant had not preserved the error, if any, for appellate review regarding the trial court informing the jury that it had overruled Applicant's objection to the State's attempt to offer Applicant's grand jury testimony, which had occurred outside the jury's presence. *Martinez III*, 147 S.W.3d at 417-20.

An evidentiary hearing was held on the writ application.[18] Counsel took the stand, but he could not remember much from the trial because it had taken place ten years prior. Counsel testified that he did not recall his exact thought processes at the time of trial, but he believed that it was possible that he made a conscious decision not to continue to object to the gang-related testimony. He explained that such decision could have been a strategic move because he did not want to call further attention to or emphasize the gang-related testimony in front of the jury, especially when the court had overruled his objection to other gang-related evidence. Further, he did not think that it would have impacted the verdict if he had continued to object to the gang-related evidence because he believed that the State's sponsoring witness, Garcia, was not very credible. Counsel did indicate a mistaken belief that a running objection was made, admitting that such an objection would have preserved the issue for appeal, but he did not know how it would have influenced the jury's decision.

The trial court entered findings of facts and conclusions of law, suggesting that we deny relief for this writ of habeas corpus. We will agree and will deny relief.

## II. CASELAW

A defendant has a Sixth Amendment right to effective assistance of counsel. U.S. CONST. amend. VI. An attorney's function "is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). To

---

[18]Applicant was present but did not testify.

determine whether to grant habeas corpus relief for ineffective assistance of counsel, Texas courts apply the standard set forth in *Strickland*, which requires the applicant to establish two components.[19]  *See Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986).

First, the applicant must show that her attorney's performance was deficient, meaning it "fell below an objective standard of reasonableness . . . under prevailing professional norms" and according to the necessity of the case.  *Strickland,* 466 U.S. at 687-88; *Ex parte Morrow,* 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (en banc). Because there "are countless ways to provide effective assistance in any given case," a reviewing court must be highly deferential and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (quotation marks omitted).

Second, the applicant must demonstrate that she was prejudiced by her attorney's performance.  That is, taking into account the totality of the evidence before the judge or jury, "there is a reasonable probability[20] that, but for counsel's unprofessional errors, the

---

[19]The two prongs of *Strickland* need not be analyzed in a particular order—the prejudice prong may be analyzed first and the performance prong second.

[20]"A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

result of the proceeding would have been different." *Id.* at 694, 696. Thus, an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Id.* at 687. It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, she must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

To successfully assert that trial counsel's failure to object amounted to ineffective assistance, the applicant must show that the trial judge would have committed error in overruling such an objection. *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004); *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996).

The applicant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999). The reviewing court must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias. *Strickland*, 466 U.S. at 690. In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Id.* at 696.

### III. ANALYSIS

Applicant claims that she received ineffective assistance of counsel at trial. Applicant contends that Counsel's performance fell below the objectively reasonable standard because he neither continued to object to the gang-related evidence nor obtained a running objection to the same. She further argues that, but for the deficient conduct, she would have received a new trial as ordered by the court of appeals.

The two prongs of *Strickland* need not be analyzed in a particular order, and we turn first to the prejudice prong. *See id.* at 697. We must determine whether, in the context of the overall record, Applicant has shown by a preponderance of the evidence that Counsel's deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result. *Id.* at 686. In its findings of fact and suggested conclusions of law, the trial court determined that the evidence, even if the gang-related evidence had not been admitted, was sufficient to support the jury's guilty verdict, and that the result of trial would not have been different but for Counsel's failure to object to the gang-related evidence. We agree and conclude the Applicant has not met the prejudice prong of the *Strickland* test.

A person can be convicted of capital murder as a party to the offense, without having had the intent to commit the murder. TEX. PENAL CODE ANN. § 7.02(b); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992). A defendant is guilty as a party to an offense if the offense is committed by the conduct of another for which she is

criminally responsible.  TEX. PENAL CODE ANN. § 7.01(a).  Specifically, "[i]f in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."  TEX. PENAL CODE ANN. § 7.02(b).  In this case, therefore, Applicant may be convicted of capital murder as a party to the offense if the jury found that (1) Applicant conspired with the group to commit robbery,[21] (2) the murder occurred in furtherance of the robbery, and (3) the murder should have been anticipated as a result of carrying out the robbery.  *See Ex parte Thompson*, 179 S.W.3d 549, 552 (Tex. Crim. App. 2005).

When the gang-related evidence is disregarded, the remaining evidence against Applicant, in its totality, is strong and would support a finding by the jury that Applicant was a party to the offense.  There was evidence, *inter alia*, that Applicant was present before, during, and after the murder; that she was afraid of some individuals of the group; that she was aware that there was a plan to rob the boys if everyone were in agreement;

---

[21] Section 15.02(a)-(b) of the Texas Penal Code provides that
(a) A person commits criminal conspiracy if, with intent that a felony be committed:
    (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and
    (2) he or one or more of them performs an overt act in pursuance of the agreement.
(b) An agreement constituting a conspiracy may be inferred from acts of the parties.

that she took the victim's cell phone from his car; that she was present during the fight between Gomez, Arroyo, and the victim; that she witnessed Gomez and Arroyo beating the victim in the woods; that she handled the knife (the murder weapon); that she gave the knife to Garcia with instructions to give it to Gomez, who then stabbed the victim; and that she attempted to destroy evidence by wiping fingerprints from the car and washing any blood from her clothes.[22]

We acknowledge that gang-related evidence tends to be irrelevant and prejudicial if not accompanied by testimony that puts the evidence into context. *Dawson v. Delaware*, 503 U.S. 159 (1992). In *Dawson*, the Supreme Court held that the First Amendment prohibited evidence of the defendant's membership in the Aryan Brotherhood during the penalty hearing because merely belonging to a group proved nothing more than the defendant's abstract beliefs. *Id*. at 166. Had the prosecution, as it originally indicated it would, called an expert to testify that the Aryan Brotherhood was a

---

[22]In her brief submitted to the Twelfth Court of Appeals during the initial proceedings, Applicant's statement of facts discussed Garcia's testimony (without mention of the gang-related evidence), Applicant's videotaped statement to police, and Applicant's grand jury testimony. Then, she wrote that, in summarizing the facts as she did, she was "forced to concede that this evidence was legally sufficient to convict her, primarily because of her own statements to the police and to the grand jury. In making this concession, however, [Applicant] continues to maintain her innocence." (citations omitted). Her claim of innocence is based on the arguments that, in addition to the gang-related evidence being improperly admitted, the videotaped statement to the police was improperly admitted and the trial court committed fundamental error in advising the jury that the court had overruled Applicant's objection to the introduction of her grand jury testimony, which had been made outside the jury's presence. The Twelfth Court of Appeals rejected those arguments. *See Martinez III*, 147 S.W.3d at 417-20. Therefore, Applicant would seemingly concede that the evidence, sans the gang-related evidence, would be sufficient to support the jury's verdict, and the result of the proceeding would not be different if Counsel had objected to the gang-related evidence.

prison gang "associated with drugs and violent escape attempts" that advocated "the murder of fellow inmates," the result might have been different. *Id.* at 165. Without such evidence, however, the defendant's membership was irrelevant, and it was likely "employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 167.

Like *Dawson*, the State in this case informed the trial court that it would introduce evidence of the Northside Crips' violent activities through a gang expert, thus linking the group membership to the specific crime. But the State presented the evidence of group membership without any such accompanying testimony of the violent activities of the gang. Thus, as in *Dawson*, the jury heard evidence of group association without any context in which to place it.

Still, here the "amount of gang-related evidence was only a small percentage of the total evidence introduced during the trial of the case." *Martinez I*, 147 S.W.3d at 411. The court of appeals stated that as "it related to other evidence arguably supportive of the knowledge element, its percentage was much greater," but even if that is true, the significance of the other evidence should not be ignored or downplayed. *Strickland* requires that we look at the totality of the evidence, and in doing so, we believe that the evidence, even if the gang-related evidence had not been admitted, was sufficient to support the jury's guilty verdict.

We cannot ignore that the Twelfth Court of Appeals held that the admission of the

gang-related evidence harmed Applicant at trial. *Martinez I*, 147 S.W.3d at 410-12.

However, the *Strickland* prejudice prong applied today presents a more difficult burden

than does the harm analysis under Rule 44.2 of the Texas Rules of Appellate Procedure,

which the court of appeals applied. Rule 44.2(b) for non-constitutional errors provides

that "a conviction should not be overturned if the appellate court, after examining the

record as whole, has fair assurance that the error did not influence the jury, or had but a

slight effect." *Martinez I*, 147 S.W.3d at 41; *see Johnson v. State*, 967 S.W.2d 410, 417

(Tex. Crim. App. 1998). In contrast, the prejudice prong of *Strickland* requires that we

look to the totality of the circumstances and evidence presented to determine if there is a

reasonable probability that, but for Counsel's deficient performance, the result of the

proceeding would have been different. *Strickland*, 466 U.S. at 694. Presiding Judge

Keller has compared the two standards:

> . . . if the error is ineffective assistance of counsel, in order to prevail appellant must meet the second prong of *Strickland*, i.e., he must meet the burden of establishing harm. If he meets that prong, he has exceeded what he needs to prove under either (a) or (b) of the harmless error rule, and he gets relief. Appellant would actually be better off if this is non-constitutional error because in that case his burden is less than the burden imposed by the second prong of *Strickland*.

*Williams v. State*, 958 S.W.2d 186, 198 (Tex. Crim. App. 1997) (en banc) (Keller, J.,

dissenting). We do not address the court of appeals's harm analysis today, but even

supposing the court of appeals was correct in holding that Applicant was harmed, it is not

inconsistent for us to hold that Applicant has not proven prejudice under *Strickland*.[23]

We conclude that the record does not support the conclusion that Applicant met the second prong of the *Strickland* test. There was ample evidence to support a reasonable jury's finding of guilt. We cannot say that there is a reasonable probability that the outcome would have been different if Counsel had objected to all of the gang-related evidence. It is unlikely, in the face of all the evidence with which the jury was presented, that the jury would have reached a different conclusion in the absence of the gang-related evidence, and so we need not address the first prong of *Strickland*.

## IV. CONCLUSION

We conclude that Applicant has not proven by a preponderance of the evidence that she was prejudiced by Counsel's performance. Therefore, Appellant has failed to demonstrate that she received ineffective assistance of counsel. Relief is denied.

Meyers, J.

Delivered: 01/12/2011

Publish

---

[23]Applicant contends that, had Counsel properly objected to the introduction of all the gang-related evidence, this Court would not have reversed the ruling of the court of appeals, and she would have received a new trial as ordered by the court of appeals. While this may be true, Applicant overlooks the differences between the Rule 44.2 harm analysis and the *Strickland* standard applied today.